# In the United States Court of Federal Claims

No. 20-1884C
Filed: May 4, 2021
Reissued: May 21, 2021[1]

---

**MELWOOD HORTICULTURAL
TRAINING CENTER, INC.,**

            *Plaintiff,*

**v.**

**THE UNITED STATES,**

            *Defendant.*

---

*Meghan A. Douris* and *Alix K. Town*, Oles Morrison Rinker & Baker, LLP, Seattle, WA, for Plaintiff.

*Tanya B. Koenig*, Trial Attorney, and *Steven C. Hough*, Trial Attorney, with whom were *Douglas K. Mickle*, Assistant Director, *Martin F. Hockey*, Acting Director, *Brian M. Boynton*, Acting Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., *Robert B. Neill*, United States Army, and *Timi N. Kenealy*, United States AbilityOne Commission, Of Counsel, for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

    This pre-award bid protest is the sequel to *Melwood Horticultural Training Ctr., Inc. v. United States*, 151 Fed. Cl. 297 (2020) ("*Melwood I*"). Like the original, Plaintiff Melwood Horticultural Training Center, Inc. ("Melwood") challenges the second iteration of a pilot procurement program to recompete a base operations support services contract ("BOSS Contract") at Fort Meade, Maryland. Melwood also brings a claim related to the United States' public release of declarations in *Melwood I* which allegedly included source selection information.

    The Court previously dismissed Melwood's bid protest claims in *Melwood I*, finding that because Melwood had not challenged a final agency action, that case was not yet ripe. Now,

---

[1] This Opinion is being reissued with redactions proposed by the parties on May 13, 2021. (ECF No. 36-1). Additionally, three sentences of this Opinion have been modified to remove citations to a case that has been abrogated by the Supreme Court. These modifications were discussed in the status conference held May 21, 2021.

however, Melwood challenges the AbilityOne Commission's decision to re-compete the BOSS Contract using new "Interim Policies" that create what AbilityOne calls a test pilot (the "Pilot Program").

Like many challenges to agency action, this bid protest is illustrated by a familiar metaphor, presenting the question of whether the horse not only pulls the cart but also determines its destination. Because the Court determines that it is Congress who fixes the objective rather than the agency, the novel AbilityOne Commission Pilot Program impermissibly introduces competitive pricing into a procurement intended by Congress to support employment opportunities for the blind and severely disabled. As explained below, the Court finds that these Interim Policies (and thus the Pilot Program) contravene 41 U.S.C. § 8504 and 41 C.F.R. § 51-2.7. Therefore, the Court concludes the procurement is contrary to law, and Melwood is entitled to injunctive relief that enjoins AbilityOne from awarding a contract under Opportunity Notice No. 3923. Further, the Court finds that the United States did not violate the Procurement Integrity Act in *Melwood I* filings.

## I.   Background

The parties have submitted a Joint Stipulation of Facts, from which the Court draws relevant facts, with limited revisions. (Joint Stipulation of Facts, ECF No. 13).

### A.   The Parties

Melwood Horticultural Training Center, Inc. is a not-for-profit organization exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code, which provides jobs and opportunities for people of differing abilities in the Washington, DC area. (*See* Compl. at ¶ 2, ECF No. 1). Melwood is the authorized non-profit agency ("NPA") for the services in question. (Administrative Record ("AR") at 1–2, ECF No. 10; Case No. 20-758 ECF No. 22).[2] Melwood is the current contractor through the U.S. AbilityOne Program on the Fort Meade Base Operations Support Services contract, Contract No. W91QV118C0008 ("Fort Meade BOSS"). (*Id*. ¶ 4).

The United States Army's Installation Management Command is responsible for delivering base operations support services, including traditional municipal services such as electrical supply, trash removal, facilities maintenance, and repair services at over seventy Army installations worldwide. These services allow Army installations to operate efficiently and effectively in support of national defense objectives.

### B.   AbilityOne and the AbilityOne Program

The legislation at issue in this controversy is the Javits-Wagner-O'Day Act (the "JWOD Act") that established the Committee for Purchase From People Who Are Blind or Severely Disabled, which operates as the "U.S. AbilityOne Commission" ("AbilityOne" or the

---

[2] In filing the Administrative Record for this case, the United States incorporated by reference the Administrative Record from *Melwood I*, Case No. 20-758. The pages are consecutively paginated, and thus the Court will cite interchangeably to the split record using "(AR__)."

"Commission"). *See* 41 U.S.C. § 8502(a). The AbilityOne Program is a Federal procurement program with the purpose of providing jobs in the manufacture and delivery of products and services to the Federal Government for people who are blind or have severe disabilities.

While any government effort has detractors, the accomplishments of the AbilityOne Commission cannot be overstated. AbilityOne currently employs over 45,000 blind or severely disabled individuals including approximately 3,000 veterans and wounded warriors.[3] These employees work at over 1,000 locations throughout all 50 states and Guam. It is the largest source of employment opportunities for the blind and severely disabled in the United States and provides as much as $4 billion in sales and services to the Federal Government.

Procurements involving AbilityOne are readily distinguishable from normal government processes. As it acknowledges, "AbilityOne procurements are considered 'other than competitive' procurements . . .."[4] To achieve its goals, AbilityOne is required to maintain a "Procurement List" of products and services "determined by [AbilityOne] to be suitable for the Federal Government to procure" that are produced or provided by a qualified nonprofit agency for the blind or by a qualified nonprofit agency for other severely disabled. 41 U.S.C. § 8501(a)(1). Congress directed the AbilityOne Commission to "designate a central nonprofit agency or agencies to facilitate the distribution, by direct allocation, subcontract, or any other means, of orders of the Federal Government for products and services on the procurement list among qualified nonprofit agencies for the blind or qualified nonprofit agencies for other severely disabled." 41 U.S.C. § 8503(c). As relevant here, AbilityOne designated SourceAmerica as a central nonprofit agency ("CNA") which represents the interests of severely disabled people who provide services on the Procurement List. 41 C.F.R. § 51-3.1. AbilityOne determines the Fair Market Price ("FMP") for those products and services, which are provided by nonprofit agencies that employ the blind and severely disabled. 41 U.S.C. § 8503(c).

The JWOD Act requires that "[a]n entity of the Federal Government intending to procure a product or service on the procurement list . . . shall procure the product or service from a qualified nonprofit agency for the blind or a qualified nonprofit agency for other severely disabled in accordance with regulations of [AbilityOne] and at the price [AbilityOne] establishes if the product or service is available within the period required by the entity." 41 U.S.C. 8504(a); *see also* Federal Acquisition Regulation ("FAR") § 8.704(a) ("41 U.S.C. chapter 85 requires the Government to purchase supplies or services on the Procurement List, at prices established by [AbilityOne], from AbilityOne nonprofit agencies if they are available within the period required."). The JWOD Act defines "qualified nonprofit agency for other severely disabled" as an agency that "in the production of products and in the provision of services (whether or not the products or services are procured under this chapter) during the fiscal year employs blind or

---

[3] U.S. AbilityOne Commission, AbilityOne Facts, https://www.abilityone.gov/index.html (last accessed May 4, 2021).

[4] U.S. AbilityOne Commission, AbilityOne Program Frequently Asked Questions, FAQ #4, https://www.abilityone.gov/abilityone_program/faqs.html#1 (last accessed May 4, 2021).

other severely disabled individuals for at least 75 percent of the hours of direct labor required for the production or provision of the products or services." 41 U.S.C. § 8501(6)(c).

Under the Competition in Contracting Act ("CICA"), executive agencies may conduct procurements using procedures that are "other than competitive" only when specifically authorized by statute.  10 U.S.C. § 2304(a) and (c)(5) (DoD procurements); 41 U.S.C. § 3304(a)(5), (e)(4)(D); FAR §§ 6.302-5, 8.002, 8.7. Otherwise, agencies must use "competitive procedures" which entail "full and open competition[.]" 10 U.S.C. § 2302(2); 41 U.S.C. § 152.

Typically, when Federal agencies identify suitable products or services to be placed on the Procurement List, they provide AbilityOne or the designated CNA (here SourceAmerica) with information, such as "the latest solicitation and amendments, bid abstracts, procurement history, estimated annual usage quantities, and anticipated date of next solicitation issuance and opening may be needed . . . statement of work and applicable wage determination" to enable AbilityOne to determine whether a product or service is suitable to be furnished by an NPA. 41 C.F.R. § 51-5.1(b). The CNAs provide such documentation to interested NPAs.

NPAs initially submit a technical proposal to the CNA, without pricing, in response to published opportunity notices and accordance with allocation processes established by the CNAs and in accordance with Commission Policy 51.301.[5] The NPAs' proposals indicate how each will meet the contract technical requirements, while also satisfying the JWOD Act employment requirements. *See* 41 C.F.R. §§ 51-4.3 and 51-6; Commission Policy 51.301.

SourceAmerica typically evaluates the technical proposals, which may include review by the government customer, to identify an NPA to perform the contract. After an NPA has been identified as the recommended nonprofit agency, the pricing process historically includes negotiations between the government customer, the selected NPA, and SourceAmerica. This cooperative approach is highlighted on AbilityOne's website. *See supra* note 3, FAQ #15. SourceAmerica recommends that suitable services be added to the Procurement List, and recommends an authorized NPA to perform those services, together with the recommended fair market price, to the Commission for approval. Pursuant to the JWOD Act, AbilityOne has the sole authority to establish the Fair Market Price "of products and services contained on the procurement list that are offered for sale to the Federal Government." 41 U.S.C. § 8503(b).

AbilityOne has issued Pricing Policies for establishing a fair market price, Policy 51.600; a fair market price for services, Policy 51.620; and resolving price impasses, Policy 51.640.[6]

---

[5] AbilityOne Commission Policy 51.301 is publicly available on the AbilityOne Commission's website. *See* https://www.abilityone.gov/laws,_regulations_and_policy/commission_policy_51_300.html (last accessed May 4, 2021).

[6] AbilityOne Commission Policy 51.600 *et seq.* is publicly available on the AbilityOne Commission's website. *See* https://www.abilityone.gov/laws,_regulations_and_policy/commission_policy_51_600.html (last accessed May 4, 2021).

AbilityOne's Pricing Policies allow for "negotiations between the Government contracting activity (or its designated prime contractor) and the designated NPA(s), with support from the responsible CNA [here SourceAmerica]." Commission Policy 51.620, Pricing AbilityOne Services, Section 6(a). Additionally, the policy requires that "[t]he prices shall be evaluated using the proposal analysis techniques described in FAR 15.404." *Id.* at Section 6(a)(i).

The Commission establishes fair-market prices for supplies and services purchased from NPAs and may request that the agency responsible for acquiring the supplies or services assist the Commission in establishing or revising these fair-market prices pursuant to FAR § 8.707(c). *Melwood I*, No. 20-758, ECF No. 27 ¶ 5 (Fed. Cl.) (Corrected Declaration of J. Randall Robinson). Prices are revised in accordance with changing market conditions under AbilityOne procedures, which include negotiations between contracting activities and producing nonprofit agencies, assisted by central nonprofit agencies, or the use of economic indices, changes in nonprofit agency costs, or other methodologies permitted under these procedures." 41 C.F.R. § 51-2.7(b); *see also* 41 C.F.R. § 51-5.5(d). Prices for services are normally adjusted annually. FAR § 8.707(b).

The Commission Policy regarding services also includes the following statement: "(b) Recommended-FMPs, submitted to the Commission by the CNAs on behalf of the NPAs and the Contracting Activities, shall take into consideration the Government's socioeconomic objective and purpose of the AbilityOne Program, which is to provide employment for people who are blind or have other significant disabilities." Commission Policy 51.620, Pricing AbilityOne Services, Section 6(b). The negotiated prices are then "submitted to the Commission by the CNAs on behalf of the NPAs and the Contracting Activities" as "Recommended FMPs." *Id.*

Pursuant to Commission Policy 51.301, the Commission "[r]etains the authority, on an exception basis, to direct CNA(s) to reassign or reallocate work using CNA-established procedures." This responsibility can be exercised to meet critical product or service delivery requirements and/or to further the AbilityOne Program mission to enhance employment opportunities or other significant programmatic matters.

Once the Commission has determined that the work is suitable for the Procurement List, that the recommended NPA is qualified and capable, and the Fair Market Price, the Commission publishes the products or services being added to the Procurement List in the Federal Register and notifies the contracting activity. 41 C.F.R. § 51-6. After the addition to the Procurement List is effective, the federal customer may award a contract pursuant to the AbilityOne Program, typically for a Base Year with four follow-on option years.

Once a product or service is added to the Procurement List, it remains in the AbilityOne program unless the Commission "determines that none of the nonprofit agencies participating in the AbilityOne Program are capable and desirous of furnishing the commodity or service to the Government, or if [AbilityOne] decides that the commodity or service is no longer suitable for procurement from nonprofit agencies employing people who are blind or have severe disabilities." 41 C.F.R § 51-6.8(e). Among other functions, the Commission is responsible for determining a fair market price for products and services on the Procurement List. *See* 41 U.S.C. §§ 8503 (a)-(g), 8504; and 41 C.F.R. § 51-2.2(a)–(i).

C.  *Contract Background*

Fort Meade is one of the installations managed by Installation Management Command. The Fort Meade BOSS contract supports the infrastructure on the installation, for example, construction, life-cycle operation, maintenance, infrastructure, utility systems, roads, and other real property. Fort Meade provides a wide range of support to approximately 118 organizations from all four military services and several federal agencies.

Since July 1, 2011, Melwood has been providing certain base operation support services for the Department of Public Works at Fort Meade under contracts procured pursuant to the JWOD Act. (*See* AR 1–2, 91–324). The Army's Mission Installation Contracting Command awarded the current BOSS contract at Fort Meade—a short-term bridge contract—on July 1, 2019. (AR 91 (Contract No. W9124J-19-C-0020)). The Army awarded the base year for an estimated amount of $19,727,317.34. (*Id.*). The contract included a base year and two short term option periods, permitting performance of services through June 30, 2021. Melwood has been asking for a new five-year contract and has not received an explanation for why it was receiving short bridge contracts. *Melwood I*, No. 20-758, ECF 46-2, ¶ 10, Exhibit A (Fed. Cl.).

AbilityOne added Fort Meade Base Operations Support Services to the Procurement List in 2011. 41 U.S.C. § 8501 *et seq.* requires "the Government to purchase these services from AbilityOne nonprofit agencies if they are available within the period required." FAR § 8.704(a). (AR 1–2). Melwood was selected as the designated NPA to perform this work. The scope of work of the Fort Meade BOSS contract includes recycling, roads and grounds maintenance, custodial, electrical, plumbing, and HVAC services. (AR 221–319).

D.  *AbilityOne Competition Pilot Test*

In Section 898 of the National Defense Authorization Act for Fiscal Year 2017 ("NDAA") Congress mandated the establishment of a Panel on Department of Defense and AbilityOne Contracting Oversight, Accountability, and Integrity ("Section 898 Panel") to review purchasing arrangements between the Department of Defense and the nonprofit agencies under the JWOD Act/AbilityOne Program. NDAA, Pub. L. No. 114-328, § 898, 130 Stat. 2000, 2327–29 (2016). Section 898(c)(6) stated that the 898 Panel was to, among other things, "recommend ways the Department of Defense and the AbilityOne Commission may explore opportunities for competition among qualified nonprofit agencies or central nonprofit agencies and ensure an equitable selection and allocation of work to qualified nonprofit agencies." NDAA, Pub. L. No. 114-328, § 898, 130 Stat. 2000, 2329 (2016). Congress's use of the word "recommend" is significant for the reasons explained in Section II(B)(1) of this Opinion.

On July 18, 2018, the Section 898 Panel submitted its first annual report to Congress. (AR 15–84 (First Annual Report)). This report included a recommendation that the AbilityOne Commission "[i]mplement mandatory source selection procedures that CNAs will follow that require a best value trade-off similar to other Federal source selection procedures." (AR 45). The Section 898 Panel recommended that the AbilityOne Commission use competition pilots to "[p]ilot different approaches to make a sound decision on the appropriate way forward." (*Id.*). The Section 898 Panel also recommended: "changes to how work is assigned or re-assigned, and also changes to Title 41 CFR 51 . . . [t]his process includes steps that reward NPAs who do well

on a product or service, by giving them Commission approval to continue. Those who do not, would either see the work reassigned or would have to re-compete . . ..” (AR 44).

Notably, Congress did not act on the Section 898 Panel's recommendations, nor did the AbilityOne Commission adopt regulations despite its authority to do so. Instead, in June 2019, the Commission adopted interim policies to address the modifications to the allocation process for the competition pilot. (*See* AR 85–87 (AbilityOne Interim Pilot Test policy 51.301.01, Selection of Nonprofit Agencies for Project Assignment and Order Allocation); 88–90 (AbilityOne Interim Pilot Test Policy 51.620.01, Pricing AbilityOne Services)). Interim Pilot Test Policy 51.301.1, “a companion to existing policy 51.301,” communicated changes to aspects of pilot test(s) in which “a competitive nonprofit agency (NPA) recommendation process will be conducted, considering technical capability, past performance, and price. The pilot test will result in the competitive reallocation of a project already on the Procurement List and establishment of a new Fair Market Price.” (AR 85). The Interim Policy also identified an appeals process: NPAs should send appeals to the Commission 10 days “after an NPA's debriefing or notice of the Commission's debriefing or notice of the Committee's decision.” (AR 87). The interim policy indicated the Commission was exercising its authority in accordance with Policy 51.301 to direct CNA(s) to reassign or reallocate work using CNA-established procedures. Further, the Commission had determined that pilot test(s) are in the best interest of the government to further the AbilityOne Program mission and identify processes that may be required when adopting new business practices. (*Id.*). This announcement provided the first suggestion that future pricing of goods and services would occur as part of the procurement evaluation rather than the historically preferred negotiations between the procuring NPA and the procuring agency with the assistance of SourceAmerica after the NPA(s) were selected.

The Army and the Commission conducted an initial competition pilot for the BOSS contract at Fort Bliss, Texas in 2019. (*See* AR 325, 1470). The Army determined the pilot to be a success, finding that it yielded “an annual savings of $7.2 million and a projected $36 million over the contract term” for the Army, as well as “significantly better contract performance . . . because it forced contractors to rethink how they do business, employing current technologies to provide greater quality, efficiency and cost savings,” while continuing to “provide employment opportunities for people who are blind or have significant disabilities.” *Melwood I*, No. 20-758, ECF No. 27 ¶ 7 (Fed. Cl.) (Corrected Declaration of J. Randall Robinson); (*see* AR 1470 (The Fort Bliss competition pilot “result[ed] in a 20% cost savings to the Army over the life of the contract.”)).

Pride Industries, the incumbent contractor at Fort Bliss, alleged that the Pilot Program conflicted with JWOD and challenged that procurement under the Administrative Procedure Act (“APA”), 5 U.S.C. § 500 *et seq. Pride Indus., Inc. v. Comm. for Purchase From People Who Are Blind or Severely Disabled*, 420 F. Supp. 3d 1035 (E.D. Cal. 2019). Pride Industries sought a preliminary injunction to enjoin AbilityOne from further action to award a services contract. *Id.* at 1037. Similar to this Court's decision in *Melwood I*, the court in *Pride Industries* found that the adoption of the Pilot Program itself did not meet the standards for “final agency action” required by the APA, thus Pride Industries could not demonstrate the first element necessary to obtain injunctive relief. *Id.* at 1045. However, that court noted “serious questions regarding whether the Pilot Program is fully compliant” with JWOD. *Id.* at 1046, n.4.

Following the initial competition pilot at Fort Bliss, "[i]n December 2019, the Army requested that the Commission conduct [the next] allocation Competition Pilot Test" for the BOSS contract at Fort Meade, Maryland. (AR 1471, 340–42). In January 2020, the Section 898 Panel submitted its second report to Congress. (Compl. Exhibit 1 (Second Annual Report)). In the Second Annual Report, the Section 898 Panel, on Recommendation 16—"[e]stablish business rules for competition and assignment of work among AbilityOne Program NPAs"— stated that "[t]he Commission does not have any business rules for competition and re-competition but they are in the process of revising the C.F.R. to acknowledge Commission authority to reallocate work." (Second Annual Report at 50).

The Section 898 Panel stated that a Course of Action should include revising 41 C.F.R. § 51 "to clarify the Commission's authority to transfer work within the AbilityOne Program" because "[i]ncreasing competition within the AbilityOne Program will promote employment growth among people who are blind, disabled, and veterans; and will have a positive impact on pricing for federal customers." (Second Annual Report at 51). However, these proposed revisions to 41 C.F.R. § 51 never occurred.

In the Second Annual Report, the Section 898 Panel also stated that the timeline for implementing Recommendation 18—reduce the existing gaps and deficiencies in CNAs' processes—was intended to include a "12 month timeline (after pilot contract [for Fort Bliss] is awarded) for AbilityOne Commission to evaluate best practices and lessons learned from the Commission/Army Pilot (December 2020)." (Second Annual Report at 56). As also demonstrated in the current record, AbilityOne had not complied with the second Section 898 Panel report recommendations. Moreover, Congress again did not act on the Section 898 Panel's recommendations and to date, AbilityOne did not enact new regulations, acting instead by unilateral policy.

On May 16, 2020, the AbilityOne Commission emailed Melwood's President & CEO to advise that the Army had selected the Fort Meade BOSS contract as the second service contract to be competed using a competition pilot as it has done in the past. (AR 347). On May 28, 2020, the AbilityOne Commission and the Army executed a Memorandum of Agreement memorializing procedures to be employed for conduct of the competition pilot for the Fort Meade BOSS contract. (AR 358). The purpose of the Memorandum of Agreement was "[t]o maximize savings and create a 'competitive' contracting environment to the greatest extent possible," with an ultimate goal to "incorporate lessons learned from the pilot program towards developing a competitive process for the AbilityOne Commission to use on acquisitions Army-wide in an effort to obtain efficiencies with AbilityOne contracts." (AR 354). The Memorandum of Agreement provided that "SourceAmerica will identify qualified participating NPAs with capability to perform [base operations] services and issue the RFP/Opportunity Notice to the NPAs." (AR 355). The Memorandum of Agreement also provided that "[a]n Evaluation Team, Chaired by the Commission's Director of Contracts and Policy, will evaluate NPA proposals against the stated Evaluation Factors." (*Id.*). As stated in the Memorandum of Agreement, "[t]he Commission and MICC will provide Cost/Price Analysis to evaluate Cost/Price submissions from NPA," and that, "[c]onsistent with the AbilityOne Commission's statute and regulations, at the conclusion of any negotiations, the Commission will make the final determination of the [Fair Market Price]." (*Id.*).

E.  *The Opportunity Notice and Amendments*

On December 11, 2019, the Army conducted an Independent Government Estimate ("IGE") for pricing of the Ft. Meade Contract. (AR 333–39). The IGE estimated a base year total of $26,062,290.04. (AR 334). The IGE estimated a five-year total of $136,521,931.90. (AR 339).[7]

On July 14, 2020, the AbilityOne Commission formally voted, authorizing the competition pilot process for the Fort Meade BOSS Contract among the qualified non-profit agencies. (AR 1541). On July 15, 2020, SourceAmerica published Opportunity Notice/Response Submission Form (Version 1) #3923, the Opportunity Notice for the competition pilot. Proposals were to be due on September 8, 2020. (AR 1548). A phase-in period was anticipated between November 1, 2020 and December 31, 2020. (*Id.*). The Opportunity Notice provided that its purpose is "to conduct a competition that will include *price competition* among qualified participating nonprofit agencies of the AbilityOne Program to authorize a NPA to perform the work pursuant to 41 USC § 8503(c), 41 CFR Ch. 51, FAR 8.7 and FAR 8.002." (AR 1547) (emphasis added).

Opportunity Notice #3923 required that the NPAs submit "a price response alongside the technical response for review and assessment by the [Integrated Process Team[8]] evaluators." (AR 1547). The AbilityOne Commission anticipated recommending "the NPA whose response: 1) presents a technically acceptable offer under the Technical Response and; 2) [p]rovides the best value to the Government based upon an integrated assessment between past performance and price." (AR 1548). In the tradeoff between past performance and price, the Opportunity Notice provided that "past performance is approximately equal to price. However, the greater equality of Past Performance ratings amongst NPAs, the more important price becomes." (*Id.*). Past performance will be evaluated for recency and relevancy. (AR 1550–51). The Opportunity Notice provided that "Price will not be scored or rated," but specified that "[a]ll CLIN and sub-CLIN prices will be evaluated for Price Reasonableness and Balance." (AR 1552).

F.  *Proposals and Evaluations*

███ NPAs—Melwood, ████████████████, and ███████—responded to the Opportunity Notice by timely submitting proposals. (AR 2834–3389). Each proposal contained five volumes: the Response Submission Form; the Project Development Plan; a Right of First Refusal Implementation Plan; a Pricing Matrix; and a Financial Sustainability Worksheet. ████████ proposed the lowest total price of ███████████, for the base year, plus four option

[7] On July 23, 2020, the Army revised its IGE. (AR 2697–703). It estimated that the contract, including the base year, four option years, plus a six-month option to extend, would cost ████████████. (AR 2703). The IGE anticipated a base year cost of ███████████. (AR 2698).

[8] The Integrated Process Team ("IPT") is "managed by the U.S. AbilityOne Commission in conjunction with the federal customer, the U.S. Army, with assistance from SourceAmerica[.]" (AR 1547).



years and a six-month extension, if exercised. (AR 3386). ████████ proposed a base year price of approximately ████████. (*Id.*). ███ proposed the next lowest overall price, a total of ████████████ for the same period of time. (AR 3078). ███ proposed a base year price of approximately ████████. (*Id.*). ████████ proposed a total price of ████████ over the same period of time. (AR 2974). ████████ proposed a base year price of approximately ████████. (*Id.*). ████████ proposed a total price of ████████ for the same period of time. (AR 3222). ████████ proposed a base year price of approximately ████████. (*Id.*).

Melwood now brings this action seeking to enjoin AbilityOne from awarding a contract under the Pilot Program procedures.

## II.    Analysis

The parties' cross-motions raise at least three distinct issues, broadly stated as follows: (1) whether Melwood's second assertion of a pre-award bid protest is timely in light of *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007); (2) whether the United States acted arbitrarily and capriciously or contrary to law when it included a price component in an AbilityOne procurement; and (3) whether the United States violated the Procurement Integrity Act ("PIA") when it filed the Robinson Declarations in *Melwood I*. As explained below, Melwood's second protest was timely filed. In the Court's view, Melwood has sufficiently demonstrated that the United States conducted the Fort Meade AbilityOne procurement using procedures that are contrary to law and has demonstrated that it is entitled to injunctive relief. However, Melwood has failed to establish that the United States violated PIA because it did not timely raise that issue with AbilityOne.

### A.    *Melwood's second protest is timely, thus the United States' Motion to Dismiss is denied.*

In its Response and Cross-Motion for Judgment on the Administrative Record, the United States moves to dismiss Melwood's protest as untimely filed. (Def.'s Mot. at 5, ECF No. 22). In support of its Motion, the United States argues that despite Melwood's prior protest, Melwood's instant protest is untimely under the waiver rule established by the Federal Circuit in *Blue & Gold Fleet*. (*Id.* at 8). The United States observes that the Court determined that Melwood's first challenge was premature. (*Id.*) It argues that Melwood's combined failure to amend its Complaint in that protest and its waiting 20 days to file another Complaint after the Court issued the *Melwood I* decision constitute Melwood's "[sitting] on its rights to challenge what it believed was an unfair solicitation[.]" (*Id.*). Consequently, the United States argues, the Court must dismiss Melwood's Complaint. (*Id.* at 10).

Melwood responds that its initial protest put the United States on notice of perceived deficiencies in the procurement process for Opportunity Notice 3923—the Opportunity Notice for this competition pilot. (Pl.'s MJAR at 3, ECF No. 15). Melwood asserts that once it received notice of the Court's decision in *Melwood I*, it diligently prepared a second, more targeted protest. (*Id.*). Melwood persuasively contends that it did not "[sit] on its rights" but rather "vocally object[ed]" to serious flaws in the procurement, bringing its concerns to the attention of both the Court and the procuring agency. (*Id.* at 3–4).

In *Blue & Gold Fleet*, the Federal Circuit recognized the utility of adopting a rule, based on laches and equitable estoppel, that barred a protestor who "[had] the opportunity to object to the terms of a government solicitation containing a patent error and failed to do so prior to the close of the bidding process[.]" 492 F.3d at 1315. The Federal Circuit held that where a protestor knew of a patent legal defect in the procurement but waited to protest until after the agency selected a proposal, that the protestor had waived its opportunity to raise the issue. *Id*. The *Blue & Gold* waiver rule "implements Congress's directive . . . that courts 'shall give due regard to . . . the need for expeditious resolution' of protest claims." *Bannum, Inc. v. United States*, 779 F.3d 1376, 1380 (Fed. Cir. 2015) (quoting 28 U.S.C. § 1491(b)(3)).

While the scope of the Federal Circuit's holding in *Blue & Gold Fleet* was limited to objections made prior to the close of the bidding process, the Circuit expanded that rule in *COMINT Sys. Corp. v. United States*, 700 F.3d 1377 (Fed. Cir. 2012). In *COMINT*, the Circuit considered whether a protest to a post-bidding process, pre-award amendment was timely when it was brought *after* the agency made the award. *Id*. at 1381–82. The Circuit determined that the protest was not timely, finding that the protestor must have raised its challenge to the post-bidding process amendment prior to an award. *Id*. at 1381. The Circuit went further, however, clearly stating that "[t]he same policy underlying *Blue & Gold* supports its extension to all pre-award situations." *Id*. at 1382. In justifying its decision, the Circuit reasoned that, like in *Blue & Gold Fleet*, the protestor had "ample time and opportunity to raise its objections . . . but chose instead to wait and see whether it would receive" the award of the contract. *Id*. at 1383. The Circuit characterized its decision as denying the protestor a "second bite at the apple," or absent the metaphor, a second opportunity to participate in the bidding process. *Id*.

Here, Melwood does not seek a "second bite at the apple," nor has it "sat on its rights" because it has, from the beginning, vocally and diligently asserted a flaw in the procurement process. In *Melwood I*, Melwood sounded an early alarm about the procedures AbilityOne attempts to utilize for its Pilot Program. Too early, in fact. In *Melwood I*, the Court explained that despite its concerns, it could not exercise jurisdiction before final agency action, and in informing the parties of that defect, noted an eschewed remedy—an amended complaint. But that does not change the fact that Melwood's current protest is timely both for the purposes of the Court's jurisdiction and *Blue & Gold Fleet*. The purpose of the *Blue & Gold* waiver rule is to ensure protestors raise concerns early, and diligently exercise their rights to avoid waste in litigating portions of the procurement process that could have been rectified if the deficiencies had been identified earlier. *Blue & Gold Fleet*, 492 F.3d at 1314. It is surely not intended to lay a trap for the overly earnest. Therefore, the Court finds the *Blue & Gold* bar does not apply here because in *Melwood I*, Melwood raised its objections to the procurement at issue, and thus has not waived them for the purposes of this protest. Accordingly, the United States' Motion to Dismiss must be denied.

> **B.   The AbilityOne Pilot Program is contrary to law, thus Melwood is entitled to judgment on the administrative record.**

Melwood argues that the Pilot Program violates 41 U.S.C. §§ 8503–8504, as well as 41 C.F.R. § 51-2.7 and various provisions of the FAR. (Pl.'s MJAR at 21–24, ECF No. 15-1). Melwood further argues that the 2017 NDAA did not authorize any changes to those statutes and regulations that would permit the creation of the Pilot Program. (*Id*. at 25). Finally, Melwood

argues that the United States' decision to recompete the Fort Meade contract is unsupported by the Administrative Record, and thus is arbitrary and capricious. (*Id*. at 25–34).

The United States counters by citing heavily to the deference the Court owes to administrative agencies. The United States argues that agencies have wide discretion to take actions unless those actions are specifically prohibited by law. (Def.'s Mot. at 11). The United States walks through the relevant provisions of the JWOD Act, its administering regulations, and the FAR in arguing that no single provision specifically prohibits implementation of a Pilot Program or a price-based competition for AbilityOne procurements. (*Id*. at 11–24).

The Court reviews agency procurement decisions to determine whether the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (quoting the APA, 5 U.S.C. § 706(2)(A)) (internal quotation marks omitted). Under this standard, an agency's decision "may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). On the first ground, contracting officials are entitled to exercise discretion, but must provide "a coherent and reasonable explanation of its exercise of discretion . . . and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id*. at 1333 (internal citations and quotation marks omitted). To win a protest brought on the second ground, the protestor must show "a clear and prejudicial violation of applicable statutes or regulations." *Id*. (internal quotation marks omitted).

The Court begins by recognizing that it does owe a great deal of deference to administrative agency determinations. *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000)). That deference is not, however, unbridled. The question here is essentially whether AbilityOne, forsaking its own rulemaking authority, is permitted to overwrite the JWOD Act and its corresponding regulations through "Interim Policies" that create a "Pilot Program." Because the Court concludes that JWOD and the regulations promulgated thereunder established a scheme of "other-than-competitive" procurements with a collaborative pricing process, the United States' pilot program is contrary to law. This is not to say that introducing a price component can never be utilized in AbilityOne procurements, nor that use of competitive pricing may not be advantageous to the United States. On the contrary, the Court only holds that the agency may not depart from its enabling statutes and its own regulations by adopting policies that conflict with the statutory and regulatory scheme.

The crux of Melwood's challenge is whether AbilityOne's Pilot Program, implemented through interim procurement procedures, is a permissible exercise of agency authority, or whether those "Interim Policies" are in contravention of applicable statutes or regulations. Because Congress and AbilityOne have previously set forth procedures for conducting AbilityOne Program procurements, Melwood's challenge must succeed if the "Interim Policies" contravene duly enacted statutes or AbilityOne regulations that have suffered the notice-and-comment rulemaking procedures.

Thus, there are two elements to Melwood's challenge. First, whether the Pilot Program procedures run afoul of AbilityOne's charging statutory authority. Second, whether the Pilot Program procedures run afoul of AbilityOne's own procurement regulations.

### (1)    The Pilot Program is contrary to 41 U.S.C. § 8504.

The answer to the first question is fairly short. AbilityOne created the Pilot Program using "Interim Policies." These Interim Policies are essentially a pair of internal policy memos detailing how the Pilot Program will change its procurement procedures to add, among other things, a price component. (AR85–87, 88–90). The Interim Policies cite to the JWOD Act and Section 898 of the NDAA as the authority for changes to AbilityOne's pricing policies. (AR85, 88).

The JWOD Act created the AbilityOne Commission and vested it with regulatory rulemaking authority. 41 U.S.C. §§ 8502(a), 8503(d). JWOD also specified that AbilityOne was to conduct these procurements differently than traditional procurements. *See Pride Indus*, 420 F. Supp. 3d at 1046 n.4 ("the JWOD Act creates a uniquely tailored statutory scheme for providing government services contracts to the blind or severely disabled."). Particularly, JWOD mandated that AbilityOne "maintain and publish in the Federal Register a procurement list. The list shall include the following products and services determined by the Committee to be suitable for the Federal Government to procure pursuant to this chapter[.]" 41 U.S.C. § 8503(a)(1). AbilityOne was also charged with setting the prices of products and services on the procurement list. § 8503(b). Finally, and most significantly, JWOD specified that when the government procures a product or service, it must do so according to the regulations established by AbilityOne. 41 U.S.C. § 8504.

As the Court will explain below, because AbilityOne and the Army failed to follow AbilityOne's procurement regulations, it has also violated § 8504 (the contracting activity "shall procure the product or service from a qualified nonprofit agency . . . *in accordance with regulations of the Committee* and at the price the Committee establishes) (emphasis added).

Furthermore, the NDAA did not endeavor to change any of these statutes to exempt a "Pilot Program" from AbilityOne's established procurement procedure. *See Pride Indus., Inc.*, 420 F. Supp. 3d 1035, 1046 n.4 (the NDAA "does not appear to confer blanket authority to completely reform contracting processes covered by the JWOD Act."). The Court has previously explained why citation to the NDAA as a basis for the Pilot Program is problematic:

> A plain reading of the NDAA indicates that the 898 Panel is only authorized to provide *recommendations*, not implement new procedures for AbilityOne procurements. NDAA § 898(c)(2)–(7). Subsection (e) circumscribes the "authority" of the 898 Panel:
>
> > To carry out the duties described in subsection (c), the Panel may request documentation or other information needed from the AbilityOne Commission, central nonprofit agencies, and qualified nonprofit agencies.

> NDAA § 898(e). All that is granted, under a plain reading of the text, is the power to collect information in order to take the actions contemplated by subsection (c). Notably, seven of the eight delineated "duties" of the 898 Panel, as defined in subsection (c), begin with "recommend actions," "recommend changes," "recommend ways," "recommend criteria," or "review the status" of the program. NDAA § 898(c)(1)–(7). The eighth duty would require a determination by the Secretary of Defense, not simply the initiative of AbilityOne or a "contracting activity," such as the Army.

*Melwood I*, 151 Fed. Cl. at 311.

The United States argues that Congress tacitly approved of the Pilot Program when it received the Third Annual Report from the Section 898 Panel. (Def.'s Reply at 13, ECF No. 31). It follows, the United States argues, that Congress did not share Melwood's concerns over the legality of the Pilot Program or it would have acted by legislating. (*Id*.). However, the Supreme Court has recently reaffirmed that "when Congress has not comprehensively revised a statutory scheme . . . it is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval[.]" *AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, __ S. Ct. __, No. 19-508, 2021 WL 1566607 (U.S. Apr. 22, 2021) (cleaned up). Accordingly, the Court rejects the contention that Congress approved of the Pilot Program because it could have acted, but chose not to. The lack of congressional action on the Section 898 Panel recommendation to explore competitive pricing in a program that had historically eschewed such is of no significance.

The JWOD makes clear that procurements must be conducted according to AbilityOne regulations. The NDAA makes no exception for a Pilot Program. Therefore, as the Court will explain in further detail below, since AbilityOne failed to follow its own procurement regulations published in Title 41, Chapter 51 of the C.F.R., its Pilot Program procurement procedures are contrary to statute.

(2)    The Pilot Program is contrary to applicable AbilityOne regulations.

As stated above, JWOD authorized AbilityOne to promulgate regulations to govern its unique procurements. 41 U.S.C. § 8503(d); *see also* FAR § 6.302-5(b)(2) (exempting AbilityOne procurements from full and open competition in favor of procedures established by FAR subpart 8.7). Pursuant to its statutory authority, AbilityOne has published a number of procurement regulations in Title 41, Chapter 51 of the C.F.R. As required by the APA, with these regulations, AbilityOne adopted the following statement of general purpose:

> It is the policy of the Government to increase employment and training opportunities for persons who are blind or have other severe disabilities through the purchase of commodities and services from qualified nonprofit agencies employing persons who are blind or have other severe disabilities.

41 C.F.R. § 51-1.1; *see also* 5 U.S.C. § 553(c).

Within Chapter 51, Part 51-2.7 specifies how prices are determined for commodities and services on the Procurement List. 41 C.F.R. § 51-2.7. Prices are initially set at the time the

product or service is added to the Procurement List. § 51-2.7(a). That initial price can be developed through negotiations with the nonprofit contractor, the contracting activity, and the central nonprofit agency. § 51-2.7(a). This process is inherently collaborative and, by the terms of JWOD and the regulations thereunder, occurs *after* a nonprofit is selected. The parties must agree to any deviation from this process. § 51-2.7(a) ("*If agreed to by the negotiating parties*, the initial price may be developed using other methodologies[.]") (emphasis added).

AbilityOne may revise prices "in accordance with changing market conditions under Committee procedures, *which include negotiations between contracting activities and producing nonprofit agencies*, assisted by central nonprofit agencies, or the use of economic indices, changes in nonprofit agency costs, or other methodologies permitted under these procedures." §51-2.7(b) (emphasis added). While "other methodologies" (aside from negotiations) are permitted to establish a price, subpart (c) stresses that the nonprofit, as well as the other relevant entities, must agree on the changes in price or pricing procedure. § 51-2.7(c) ("Recommendations for initial fair market prices, or changes thereto, shall be submitted *jointly* by the contracting activities *and nonprofit agencies concerned* to the appropriate central nonprofit agency.") (emphasis added). In sum, AbilityOne has a long-established pricing procedure that explicitly includes the nonprofit agency in a collaborative price-setting process that occurs *after* an award decision.

Prior to the Pilot Program, AbilityOne also interpreted these regulations to require selected nonprofit agencies to actively participate in the development and negotiation of price. *See* AbilityOne Commission Policy 51.620, Pricing AbilityOne Services, Section 5(c) ("NPAs shall actively participate in the development and negotiation of the Recommended-FMP[.]"). In contrast, however, the Pilot Program does not contemplate collaborative pricing. The two "Interim Policy" memos establishing the Pilot Program create a competition where interested nonprofit agencies must submit a price bid for consideration by AbilityOne. Interim Policy 51.301.1, "a companion to existing policy 51.301," communicated changes to aspects of pilot test(s) in which "a competitive nonprofit agency (NPA) recommendation process will be conducted, considering technical capability, past performance, and price. The pilot test will result in the competitive reallocation of a project already on the Procurement List and establishment of a new Fair Market Price." (AR 85). Additionally, Interim Policy 51.620.1 directed that now, "NPAs shall provide their pricing information in accordance with the instructions included in the Opportunity Notice as well as existing and interim Commission policy and procedures." (AR 88).

In this way, the Interim Policies, which do not carry the force of law, directly contradict the provisions of 41 C.F.R. § 51-2.7. The United States argues that the competition is merely a means of price discovery, and that even with the Pilot Program, prices will still be set collaboratively. (Def.'s Mot. at 13–18). This argument is paper-thin. AbilityOne is conducting a competition to determine which nonprofit agency to add to the Procurement List. Because the Pilot Program requires nonprofit agencies to suggest a price before even being considered for the Procurement List, it forces them to negotiate against themselves before they are added to the Procurement List and thus eligible to receive the contract. Not only does the Pilot Program's procedure not align with the collaborative price-setting process contemplated by 41 C.F.R. § 51-2.7, Interim Policy 51.620.1 Section 6 fails to modify its counterpart in AbilityOne Commission Policy 51.620, Section 6(a) which states that the fair market price is "founded in negotiations

between the Government contracting activity . . . and the *designated* NPA(s)[.]" (emphasis added). While internal policy memos such as these "lack the force of law," they may be persuasive. *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000). The Court is persuaded that to the extent the Pilot Program attempts to solicit a price offer from nonprofit agencies prior to their addition to the Procurement List, that Interim Policy is not only prohibited by 41 C.F.R. § 51-2.7, but also conflicts with established AbilityOne internal policies interpreting the same regulation.

The United States further argues that this is not really a competition based solely on price because the Opportunity Notice contemplates evaluation of other factors. (Def.'s Mot. at 19). It is not simply that a "lowest price technically acceptable" procurement is prohibited by 41 C.F.R. § 51-2.7, but rather AbilityOne's introduction of a cost element *prior* to selection of the nonprofit agency is what causes this Pilot Program to fall outside of the regulatory scheme AbilityOne has created through notice and comment rulemaking. Although it is true that the Opportunity Notice contemplates accepting the "best value" offer when weighing "past performance and price[,]" it also makes clear that "the greater [the] equality of Past Performance ratings among NPAs, the more important price becomes." (AR 2709). The United States cannot plausibly argue that AbilityOne blinds itself to the prices nonprofit agencies offer as they vie for a coveted spot on the Procurement List. Therefore, the competition becomes inherently price-centric in violation of 41 C.F.R. §51-2.7.

The United States cites *Tyler Const. Grp. v. United States*, 570 F.3d 1329 (Fed. Cir. 2009) in support of the proposition that agencies have substantial leeway for creativity where an action is not specifically prohibited by a statute or regulation. (Def.'s Mot. at 11, 16, 20). In *Tyler Const.*, a small business general contractor sought to enjoin the U.S. Army Corps of Engineers from awarding an indefinite delivery/indefinite quantity ("IDIQ") contract for the design and construction of military facilities. 570 F.3d at 1330. That procurement was conducted (and challenged) under the general provisions of the FAR. *Id.* at 1331. Denying the protest, the Federal Circuit agreed with the trial court that "the various provisions of the FAR offer little insight" into whether the Army Corps of Engineers' use of IDIQ contracts was authorized. *Tyler Const. Grp.*, 570 F.3d at 1331–32 (quoting *Tyler Constr. Grp. v. United States*, 83 Fed. Cl. 94, 95 (2008)) (internal quotes omitted). Therefore, the Circuit relied on the "Statement of guiding principles for the Federal Acquisition System," which provides:

> (d) The role of each member of the Acquisition Team is to exercise personal initiative and sound business judgment in providing the best value product or service to meet the customer's needs. In exercising initiative, Government members of the Acquisition Team may assume if a specific strategy, practice, policy or procedure is in the best interests of the Government and is not addressed in the FAR nor prohibited by law (statute or case law), Executive order or other regulation, that the strategy, practice, policy or procedure is a permissible exercise of authority.

48 C.F.R. § 1.102.

Unlike *Tyler Const.*, here there is no gap in the applicable procurement regulations. The procuring agency—AbilityOne—has established its own procedures through the formal APA rulemaking process. 41 C.F.R. § 51-2.7. It cannot then create an alternative set of "interim" rules

that directly conflict with the formal procurement procedures. As Melwood has succinctly argued, AbilityOne's "creation and adoption of its 'Interim Test Pilot Procedures' cannot trump or replace the laws as written. Those 'Procedures' . . . are not subject to public comment[.]" (Pl.'s MJAR at 24). In other words, once the legislative rules established by an agency create a set of procurement procedures, there is an implicit prohibition on conducting a procurement using alternative procedures which vastly alter the requirements of the bidding process. *See McDonnell Douglas Corp. v. United States*, 670 F.2d 156, 160 (Fed. Cir. 1982) ("The terms and policy of applicable procurement regulations are to be followed, not thwarted."); *Voge v. United States*, 844 F.2d 776, 779 (Fed. Cir. 1988) ("It has long been established that government officials must follow their own regulations, even if they were not compelled to have them at all, and certainly if directed to promulgate them by Congress, as in this case.").

The United States further argues that 41 C.F.R. § 51-2.7(a) merely "permit[s]," but does not *require* negotiations to determine a fair market price. (Def.'s Reply at 5 n.3). Similarly, the United States submits that "other methodologies" contemplated by the regulations permit AbilityOne to establish a new scheme for price discovery. (*Id.* at 5, 11–13). The United States claims that the Court must show deference to these interpretations as a matter of agency policymaking. (*Id.* at 11–12). These arguments invite the Court to simply accept AbilityOne's interpretation of its own regulations in addition to the JWOD Act, (*see id.* at 11–12), yet the United States fails to include any discussion of *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019), *Auer v. Robbins*, 519 U.S. 452 (1997), or *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945), a line of cases that discuss the ever-shrinking deference that courts owe to agency interpretations. Nevertheless, those arguments appear to reflect merely the "convenient litigating position" of the United States, as the Interim Policies do not cite to 41 C.F.R. § 51-2.7 at all, much less attempt to justify the Pilot Program as one of the "other methodologies" allegedly permitted by § 51-2.7. The Court must decline "to defer to a merely convenient litigating position or *post hoc* rationalization" when reviewing agency actions. *Kisor*, 139 S. Ct. at 2417 (cleaned up). Following *Kisor* here negates those arguments.

The Court concludes that the AbilityOne procurement conducted under the Pilot Program is a "clear and prejudicial" violation of statute and regulation. *See Impresa*, 238 F.3d at 1333. The violations are "clear" because Congress and AbilityOne have developed a procurement scheme that excludes a price component. The Pilot Program not only includes price competition but makes price a central component of the selection criteria. The violations are "prejudicial" in that the Pilot Program fundamentally changes how AbilityOne contracts are bid, forcing nonprofit agencies such as Melwood to balance providing opportunities for its most severely disabled employees with cutting expenses to offer a low bid. (*See* Decl. of Larysa Kautz at ¶ 13, *Melwood I*, Case No. 20-758, ECF No. 44-2). Therefore, the Court finds that the Pilot Program constitutes both a clear and prejudicial violation of 41 U.S.C. § 8504 and 41 C.F.R. § 51-2.7.

Returning to the Court's earlier metaphor, the horse pulls the cart, but it does not determine its destination. In this sense, the driver allows the horse to choose its own steps as it travels the path to the chosen destination. Ultimately, AbilityOne is the master of its own procurement procedure and may choose the steps it takes to conduct procurements. But as "the horse," it must work within the commands transmitted by the harness and reins established by Congress. Here, Congress granted AbilityOne formal rulemaking authority, which it can and has used to establish the procurement scheme it desires. Granted, it must submit its rules to formal

notice-and-comment procedures but at the end of the day, AbilityOne likely has the rulemaking authority to craft procurement procedures that include a price component. It cannot, however, eschew that APA-mandated process to run a Pilot Program procurement using procedures that are fundamentally different from those "legislative rules" contained in Title 41 of the C.F.R. Should this Court allow the Pilot Program to stand, AbilityOne could presumably eschew 41 C.F.R. § 51-2.7 indefinitely in favor of its Pilot Program procedures. That extra-legal exercise of agency authority is unsanctioned by law or agency regulations.

>    C.  *Because the Court concludes the Pilot Program is contrary to law, it need not determine whether AbilityOne's decision to recompete the contract is supported by the administrative record.*

Melwood argues that even if the United States were permitted to proceed with the Pilot Program, the Army's selection of Fort Meade was arbitrary and capricious and lacked a rational basis because it was unsupported by the administrative record. (Pl.'s MJAR at 25–31). Additionally, Melwood argues that even if the Pilot Program were legal, the program does not relate back to the goals of the 898 Panel's recommendations and therefore lacks a rational basis. (*Id.*). The Court directly addressed this first argument in *Melwood I*, transferring that count to the District of Maryland. 151 Fed. Cl. at 311. The Court need not address the second argument because, as explained above, it concludes the Pilot Program is contrary to law.

>    D.  *The United States did not violate the Procurement Integrity Act*

In *Melwood I*, the United States filed two declarations from J. Randall Robinson. (Case No. 20-758, ECF Nos. 9, 27). Melwood argues that in releasing the declarations, the United States disclosed source selection information in violation of FAR § 1.102 and the Procurement Integrity Act ("PIA"), 41 U.S.C. § 2102(a)(1). (Pl.'s MJAR at 34; Pl.'s Reply at 23–29, ECF No. 25). However, as the United States points out, Melwood failed to satisfy the reporting requirements necessary to assert a PIA violation.

To assert a PIA violation under § 2102, Melwood was required to notify AbilityOne within 14 days of the alleged violation:

>    A person may not file a protest against the award or proposed award of a Federal agency procurement contract alleging a violation of section 2102, 2103, or 2104 of this title, and the Comptroller General may not consider that allegation in deciding a protest, unless the person, no later than 14 days after the person first discovered the possible violation, reported to the Federal agency responsible for the procurement the information that the person believed constitutes evidence of the offense.

41 U.S.C. § 2106. Melwood asserts that it met those requirements by raising its concerns with the Department of Justice in July 2020, and with SourceAmerica on October 15, 2020. (Pl.'s Reply at 26–27).

First and foremost, SourceAmerica is not a government agency or advisor, thus Melwood's report to SourceAmerica could not have preserved its PIA claim. Second, the Department of Justice is not "the Federal agency responsible for the procurement." Therefore, a

report to the Department of Justice, even if it contained the necessary evidence to support a PIA claim, does not satisfy the Procurement Integrity Act statutory reporting requirements. Melwood has failed to establish that the United States violated PIA because it did not timely raise that issue with the appropriate agency. Because Melwood did not raise a timely PIA violation, the Court need not decide the other issues related to Amended Complaint Count III.

### E.  Melwood has demonstrated entitlement to injunctive relief.

Having concluded that the United States, acting through AbilityOne and the Army, is conducting the procurement for the BOSS Contract at Fort Meade in a manner that is contrary to law, the Court must now fashion a remedy. In its Amended Complaint, Melwood requests the following injunctive relief:

1. A declaration that the selection of the Ft. Meade [BOSS] contract for the pilot program was arbitrary and capricious and an abuse of discretion;

2. An order enjoining the Commission from issuing an award for a new base operations services contract at Fort Meade until such time as the Court can determine the propriety of the Pilot Program;

3. An order enjoining the Commission from pursuing the Pilot Program as it violates the Javits-Wagner-O'Day Act, 41 U.S.C. §§ 8501-8506, 41 C.F.R. 51 and the implementing regulations set forth at FAR Part 8.7, found at Chapter 48 of the Code of Federal Regulations;

(Am. Compl. at 19).

The Tucker Act authorizes the Court to award declaratory and injunctive relief in bid protest actions. 28 U.S.C. § 1491(b)(2). In deciding whether permanent injunctive relief is warranted, the Court considers four factors: (1) whether the movant has succeeded on the merits; (2) whether the movant will suffer irreparable harm absent an injunction; (3) the balance of hardships; and (4) the public interest. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004); *see also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (same).

A permanent injunction first requires success on the merits. *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987) (citing *University of Texas v. Camenisch*, 451 U.S. 390, 392 (1981)). As held above, Melwood has succeeded on the merits of this case—the Court agrees that the Pilot Program violates the applicable statutes and regulations for AbilityOne procurements and thus is contrary to law. The United States correctly argues that the Court may not direct a contract award, or direct that the United States retain Melwood to perform the BOSS Contract at Fort Meade. (Def.'s Mot. at 42–43; Def.'s Reply at 19–20). But, as reiterated above, Melwood does not seek such relief. (Am. Compl. at 19).

Melwood has demonstrated irreparable harm. Melwood was deprived of "the opportunity to compete on a level playing field" due to statutory and regulatory violations. *Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 280, *modified*, 63 Fed. Cl. 141 (2004). The Pilot Program effectively changed the rules of the game by improperly adding a price component to the

procurement process. "Such a loss of opportunity to compete has been found sufficient to constitute irreparable harm." *Id*. Additionally, even if Melwood ultimately were successful despite the newly introduced competitive pricing scheme, it would suffer economic harm arising from a presumptively lower procurement bid. Therefore, absent an injunction prohibiting AbilityOne from awarding a contract pursuant to the Pilot Program, Melwood will suffer irreparable harm.

The United States could have argued that delay in the procurement process imposes a hardship. *See, e.g.*, *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 (2000). However, the United States makes no attempt to advance a hardship argument here. (*See* Def.'s Mot. at 42–43; Def.'s Reply at 19). Therefore, the United States has waived that issue. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief are waived.").

Public interest is served by ensuring "public officials treat contractors fairly and generally obey procurement laws and regulations." *Transatlantic Lines LLC v. United States*, 68 Fed. Cl. 48, 57 (2005). Here, Melwood has successfully demonstrated the Pilot Program violates both procurement statutes and regulations. Therefore, an injunction preventing an award based on the illegal Pilot Program undoubtedly serves the public interest.

Lastly, "those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 444 (1974) (citing Fed. R. Civ. P. 65(d)(1)). Accordingly, pursuant to our counterpart, RCFC 65(d)(1), every order granting an injunction must "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Here, it is sufficient that the United States, acting through the AbilityOne Commission and the Army, is permanently enjoined from awarding the Fort Meade BOSS Contract pursuant to Opportunity Notice Number 3923 or conducting a procurement for the For Meade BOSS Contract under procedures outlined in Interim Policy 51.301.1 and Interim Policy 51.620.1.

## III.   Conclusion

The Pilot Program, an AbilityOne procurement program conducted according to Interim Policy 51.301.1 and Interim Policy 51.620.1, is a clear and prejudicial violation of 41 U.S.C. § 8504 and 41 C.F.R. § 51-2.7. Melwood has succeeded in showing these violations and has otherwise demonstrated entitlement to injunctive relief. Consequently, the Court **ORDERS** the following:

(1) Melwood's Motion for Judgment on the Administrative Record, (ECF No. 15), is **GRANTED** with respect to Counts I & II and **DENIED** with respect to Count III.

(2) The United States' Cross-Motion for Judgment on the Administrative Record, (ECF No. 22), is **DENIED** with respect to Counts I & II and **GRANTED** with respect to Count III.

(3) The United States' Motion to Dismiss, (ECF No. 22), is **DENIED**.

(4) The United States, acting through the AbilityOne Commission and the Army, is **PERMANENTLY ENJOINED** from awarding the Fort Meade BOSS Contract pursuant to Opportunity Notice Number 3923 or conducting a procurement for the Fort Meade BOSS Contract under procedures outlined in Interim Policy 51.301.1 and Interim Policy 51.620.1.

The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/      David A. Tapp
DAVID A. TAPP, Judge